UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

LANSING COMMUNITY COLLEGE and
MIDDLE CITIES RISK MANAGEMENT
TRUST

      Plaintiffs,

v.                                         Case No. 1:09-CV-111

NATIONAL UNION FIRE INSURANCE       HON. GORDON J. QUIST
COMPANY OF PITTSBURGH, PA.,

      Defendant.
_____/

## MEMORANDUM REGARDING DIVERSITY JURISDICTION

Pursuant to the Court's Memorandum Order To Show Cause Regarding Diversity Jurisdiction entered on October 14, 2009, the parties have filed responses addressing whether Lansing Community College ("LCC") is an arm of the State of Michigan for purposes of diversity jurisdiction. Plaintiffs (collectively "LCC") assert that LCC is an arm of the state, while Defendant ("National Union") contends otherwise. For the following reasons, the Court concludes that LCC is not an arm of the State of Michigan and, therefore, is a citizen for purposes of diversity jurisdiction.

The facts of the instant insurance coverage dispute, as well as those of the underlying litigation, are adequately set forth in the Order To Show Cause and are largely unnecessary to the Court's analysis.

As the Court previously noted, courts generally look to Eleventh Amendment immunity principles for guidance in determining whether a particular public entity is a citizen for purposes of

diversity jurisdiction. *See Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260-61 (4th Cir. 2005) (citing *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 412 (11th Cir. 1999), and *Univ. of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1202 n.4, 1203 (1st Cir. 1993)); *Treasurer v. Fortsmann Little & Co.*, No. 3:02CV519(JBA), 2002 WL 31455245, at *2 (D. Conn. Oct. 15, 2002). The Sixth Circuit considers four factors in determining whether an entity is an arm of the state in the context of the Eleventh Amendment: (1) the potential liability of the state for any judgment against the entity; (2) the language used by state statutes and courts to refer to the entity, and the degree of state control and veto power over the entity's actions; (3) whether the board of the entity is appointed by state or local officials; and (4) whether the entity's functions fall within the traditional purview of state or local government. *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 51, 115 S. Ct. 394, 406 (1994)). The most important factor in the analysis is "the question of who pays a damage judgment against a[] [public] entity." *Alkire v. Irving*, 330 F.3d 802, 811 (6th Cir. 2003). More specifically, this inquiry concerns "the state treasury's *potential* legal liability for the judgment, not whether the state treasury will pay for the judgment in *that* case." *Ernst*, 427 F.3d at 359 (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431, 117 S .Ct. 900, 431 (1997) (emphasis in original). Although the Court noted in the Order to Show Cause that the Sixth Circuit considered a number of other factors in *Hall v. Medical College of Ohio*, 742 F.2d 299 (6th Cir. 1984), the Court believes that the four considerations identified in *Ernst* are adequate and dispositive of LCC's status.

    **A.**    **State's Obligation to Pay a Judgment Against LCC**

In its response, LCC notes that the Michigan Constitution requires the legislature to establish and provide for financing of community and junior colleges. Mich. Const. Art. VIII, § 7. LCC further notes that Michigan community and junior colleges are supervised by a state-created board

that advises the state board of education on the general supervision and planning for such colleges, as well as "requests for annual appropriations for their support." *Id.* Apart from constitutional authority concerning state financing of community colleges, LCC cites § 127(1) of the Community College Act of 1966, which provides that the board of trustees of a community college "may pledge state appropriations made and not yet received . . . for payment of . . . obligations." M.C.L. § 389.127(1). LCC further points out that it receives a substantial part of its funding from the state. In fiscal year 2008, the state provided approximately 27% of LCC's funding (consisting of $31,810,203 in state appropriations and $1,170,917 in state grants and contracts), and in fiscal year 2009, the state provided approximately 24% of LCC's funding (consisting of $29,762,500 in state appropriations, $1,081,916 in state grants and contracts, and $1,092,736 in state capital appropriations). (Stroebel Aff. ¶¶ 4, 5.) LCC contends that the foregoing shows that "this case does involve a matter that impacts the state treasury" because if an adverse judgment or settlement is entered against LCC in the underlying litigation, the presence or absence of insurance coverage will directly affect LCC's budget, which includes substantial funds received from state appropriations. (Pl.'s Br. at 7.)

National Union argues that a judgment in this case, whether in favor of or adverse to LCC, would have no impact upon the state's treasury. It contends that a judgment in favor of LCC would inure to the benefit of LCC and its co-Plaintiff, Middle Cities Trust, rather than the state because National Union would be required, along with Middle Cities Trust, to pay any judgment against LCC in the underlying action. On the other hand, it argues, if the Court rules in favor of National Union, only Middle Cities Trust and LCC would be financially impacted. National Union asserts that this is so because LCC receives only about one quarter of its funding from the state and raises the remainder through property taxes, tuition, and fees through which it could pay the judgment.

3

Neither argument properly addresses the point of the first factor. The proper inquiry is whether the State of Michigan would be liable for a judgment entered against LCC. *Ernst*, 427 F.3d at 359. While the Court recognizes that the instant case involves a claim by LCC for declaratory relief and that a monetary judgment will not be entered against LCC, because Eleventh Amendment immunity principles inform the analysis of whether LCC is a citizen, the Court must ask "whether, hypothetically speaking, the state treasury would be subject to 'potential legal liability.'" *Id.* at 362 (quoting *Doe*, *supra*, at 431, 117 S. Ct. at 904). In *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 115 S. Ct. 394 (1994), the Court framed the inquiry as follows: "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No" – both legally and practically – then the Eleventh Amendment's core concern is not implicated." *Id.* at 51, 115 S. Ct. at 406. Moreover, the fact that a third party may ultimately pay the judgment is irrelevant to whether the state is legally obligated to pay it. In *Regents of the University of California v. Doe*, 519 U.S. 425, 117 S. Ct. 900 (1997), the Supreme Court reversed the judgment of the Ninth Circuit holding that the University of California was not entitled to Eleventh Amendment immunity because the Department of Energy was obligated to indemnify the university for litigation costs. The Court declined to "convert the inquiry into a formalistic question of ultimate financial liability." *Id.* at 431, 117 S. Ct. at 904. Rather, it emphasized that "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Id.* Thus, contrary to National Union's assertion, the existence of insurance coverage is irrelevant to whether the state would be legally obligated to satisfy a judgment against LCC.

In *Ernst*, four state-court judges brought suit under 42 U.S.C. § 1983 and the Michigan constitution alleging that the state judicial retirement system violated the Equal Protection clauses

4

of the federal and Michigan constitutions because judges in Michigan's 36th judicial district received more favorable retirement benefits than judges based elsewhere in the state. The applicable state statute required the state to appropriate the amount of money the retirement system needed each year to meet its obligations. In addition, the Michigan Constitution made the retirement system's obligations to retirees a contractual obligation of the state owed to each retiree. 427 F.3d at 359-60. The Court concluded that a judgment against the retirement system would constitute a legal obligation of the state because if a federal court ordered the retirement system to pay the proposed class of judges sufficient funds to equalize their retirement accounts with those judges of the 36th judicial district, the state would have to satisfy the judgment if the retirement system were without sufficient funds to do so. *Id.*

The fact that LCC receives substantial funds from the state is of little significance to whether the state is legally obligated to satisfy a judgment against LCC. "The Eleventh Amendment does not apply simply because [a public entity] receives a substantial part of its financing from state funds." *Blackburn v. Floyd County Bd. of Educ.*, 749 F. Supp. 159, 163 (E.D. Ky. 1990) (citing *Rosa R. v. Connelly*, 889 F.2d 435, 437-38 (2d Cir. 1989)); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-81, 97 S. Ct. 568, 572-73 (1977) (holding that a local school district was not an arm of the state even though it "receive[d] a significant amount of money from the State").

In *Febres v. Camden Board of Education*, 445 F.3d 227 (3d Cir. 2006), the Third Circuit reversed the district court's ruling that a local school board was an arm of the state. In considering whether a judgment against the school board would be paid from the state's treasury, the district court, following a prior New Jersey district court case, concluded that a judgment against the board would ultimately be paid with state funds because the board was almost entirely state funded.

5

Although the district court acknowledged that New Jersey had no legal obligation to satisfy a judgment against the board, it reasoned that as a practical matter the state treasury would be impacted because the board would use state funds to satisfy the judgment and the state would have to replace those funds. *Id.* at 232-33. The Third Circuit held that the district court's reasoning was flawed because it ignored the central issue of whether the state had a legal obligation to pay a judgment against the board. The court of appeals acknowledged that state funds made up a large percentage of the board's budget, but it noted the non-state funds comprising the remaining portion of the board's budget were still a significant sum from which a judgment could be paid. *Id.* at 233-34. In addition, the board was authorized to raise revenues through taxes, and it could also increase funds by reducing expenses or selling assets. *Id.* at 234. Regardless, the court reasoned that the board's use of funds initially provided by the state to satisfy a judgment would be of no consequence because "once deposited in the Board's accounts, these funds belong to the Board," and thus the judgment would be satisfied with the board's rather than the state's money. *Id.* Finally, the court considered and rejected the board's argument that a judgment against it would adversely affect the state's treasury because the state would be forced to increase appropriations to replace funds the board might use to pay a judgment. It recognized that some of its earlier cases and the Supreme Court's decision in *Hess* could be read as suggesting that a court may consider "derivative consequences for the state that might flow from a substantial judgment against the sued entity," *id.* at 235, but it noted that the Supreme Court's more recent decisions in *Auer v. Robbins*, 519 U.S. 452, 117 S. Ct. 905 (1997), and *Regents of the University of California v. Doe*, *supra*, placed greater emphasis on a state's legal liability to pay a judgment. The court therefore concluded:

> [T]he practical or indirect financial effects of a judgment may enter a court's calculus, but rarely have significant bearing on a determination of an entity's status as an arm of the state. A state's legal liability (or lack thereof) for an entity's debts

6

> merits far greater weight, and is therefore the key factor in our assessment of the state-treasury prong of the . . . analysis.

*Id.* at 236.

In the instant case, while LCC does receive a significant portion of its funding from state appropriations, it receives even larger percentages from property taxes and tuition and fees – sources of non-state provided funds from which a judgment could be satisfied. (Def.'s Br. Ex. A (LCC Fiscal Year 2009 Operating and Capital Budgets.) LCC is authorized to raise the property tax rate by vote of the electors within its district. M.C.L. §§ 389.84, 389.144. In addition, LCC is authorized to borrow money and issue notes or other obligations to raise funds to pay for its operating expenses or other obligations. M.C.L. §§ 389.122(a), 389.127(1). Although LCC may pledge state appropriations made but not yet received for payment of its obligations, such a pledge is not an indebtedness of the state. M.C.L. § 389.127(1). In short, LCC has not identified, nor has the Court found, any statutory or constitutional provision under which the state would be liable to pay a judgment imposed against LCC. Even though a judgment against LCC might, as a practical matter, have some incidental impact on the State of Michigan's treasury, this Court concurs with the Third Circuit in *Febres* that the Supreme Court's recent cases compel the conclusion that the controlling factor in the analysis is the state's legal liability for the entity's debts. Since the state is not legally obligated to pay LCC's debts, this factor suggests that LCC is not an arm of the state.

**B.     State Treatment and Control of LCC**

The second factor raises two separate inquiries: (1) how do state statutes and courts refer to the entity; and (2) and how much control does the state have over the entity. Regarding the first inquiry, the Community College Act of 1966 specifies that a community college district is a separate corporate body that "may sue and be sued, and may take, condemn, use, hold, sell, lease, and convey

7

real property without restriction as to location and personal property including property received by gift, devise, or bequest, as the interest of the community college district may require." M.C.L. § 389.103(1). LCC points out, however, that state universities, such as the University of Michigan, Michigan State University, and Wayne State University, which have been recognized as arms of the State of Michigan, also hold status a corporate bodies. Mich. Const. Art. VIII, § 5. Even so, the State of Michigan differentiates between community colleges and public universities and colleges. Michigan's Governmental Immunity statute, M.C.L. § 691.1401, *et seq.*, provides that the term "political subdivision" includes the following: "a municipal corporation, county, county road commission, school district, *community college district*, port district, metropolitan district, or transportation authority." M.C.L. § 691.1401(b). Thus, community colleges are considered in the same class as municipalities and school districts – public entities generally not considered arms of the state for purposes of the Eleventh Amendment. In contrast, "state" is defined as "the state of Michigan and its agencies, departments, commissions, courts, boards, councils, and statutorily created task forces and . . . every public university and college of the state." M.C.L. § 691.1401(c).

Similarly, Michigan courts appear to consider community colleges as political subdivisions rather than as state agencies. For example, in *Doan v. Kellogg Community College*, 80 Mich. App. 316, 263 N.W.2d 357 (1978), the Michigan Court of Appeals held that Michigan community colleges are more akin to counties, cities, villages, townships, and school districts, and thus are not state agencies within the jurisdiction of the Court of Claims under the Court of Claims Act. *Id.* at 320-22, 263 N.W.2d at 359-60. Thus, both state statutes and state courts consider community colleges to be political subdivisions rather than state agencies.

Regarding the issue of state control, LCC notes that the Michigan Legislature enacted the Community College Act of 1966 as a "'uniform system of laws to govern the activities of all

community colleges in Michigan.'" (Pl.'s Br. at 5 (quoting *United States ex. rel. Deop v. Wayne County Cmty. Coll.*, 242 F. Supp. 2d 497, 527 (E.D. Mich. 2003)).) LCC further notes that while a community college district may be formed by a majority vote of the electors of the proposed district, the state board of education must first approve the formation of the district. However, the fact that the state has enacted a comprehensive statute covering community colleges is of little significance, as similar state statutes also govern the activities of counties, cities, townships, and villages. As the Supreme Court has observed: "But ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates. '[P]olitical subdivisions exist solely at the whim and behest of their State,' yet cities and counties do not enjoy Eleventh Amendment immunity." *Hess*, 513 U.S. at 47, 15 S. Ct. at 404 (citation omitted).

Regarding control of LCC's actions, while there is oversight at the state level, the bulk of the operational decisions are made locally by the locally-elected board of trustees. *See* M.C.L. §§ 389.101-389-145 (establishing the general powers and duties of community college districts and their boards of trustees). Therefore, the second factor also suggests that community colleges are not an arm of the state.

### C. Appointment by State or Local Officials

The third inquiry is whether state or local officials appoint the board members of the public entity at issue. The board members of community colleges such as LCC are elected locally by the electors of the community college district. M.C.L. § 389.54(1). This factor also indicates that community colleges are not arm of the state.

### D. Whether LCC Performs a State or Local Function

Pursuant to the Community College Act of 1966, the process for forming a community college district is initiated by the board of the intermediate school district or boards of 2 or more

9

contiguous intermediate school districts. If the state superintendent of public schools approves the proposed district, the local intermediate school district submits the propositions for formation of the district to the electors of the designated territory at a regular or special election. M.C.L. § 389.51. The ultimate decision to create a community college district is thus made at the local level. Moreover, the purpose of a community college is to provide post-secondary education primarily to those persons within its district. *See* M.C.L. § 389.105(c) (defining "community college" as "an educational institution providing collegiate and noncollegiate level education primarily to individuals above the twelfth grade age level within commuting distance"). By way of example, nonresidents pay a higher fee to attend a community college than residents. *See Doan*, 80 Mich. App. at 321, 263 N.W.2d at 360. Similarly, the tax rate for the community college district is determined at the local level, as is the case for local school districts. *Id.* Thus, community colleges in Michigan perform a function that is local in nature. This factor thus indicates that community colleges are not an arm of the state.

### E. The Totality of the *Ernst* Factors

Based upon the foregoing analysis, the *Ernst* factors compel the conclusion that Michigan community colleges are not an arm of the state. First, and most important, there is no basis to conclude that the state would be legally obligated to pay a judgment against a community college. While a judgment might have an incidental impact on the state treasury, there is no basis to conclude that the state would be responsible for satisfying the judgment. Moreover, even if the state were to approve an appropriation to satisfy the judgment, voluntary payments by a state do not trigger Eleventh Amendment immunity. *See Febres*, 445 F.3d at 234-35 (citing *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1147 (3d Cir. 1995)); *Williams v. Dallas Area Rapid Transit*, 242 F.3d 315, 321 (5th Cir. 2001) (stating that "we do not consider 'a state's voluntary, after-the-fact payment' of

a judgment to be a liability against the sate's treasury") (quoting *Hudson v. City of New Orleans*, 174 F.3d 677, 689 (5th Cir. 1999)). The remaining *Ernst* factors all show that community colleges are local in nature and not an arm of the state: (1) the State of Michigan considers community colleges to be political subdivisions rather than state agencies; (2) the boards of community colleges are elected at the local level; and (3) community colleges perform a function that is local in nature. Based upon this analysis, the Court concludes that LCC is a citizen over which this Court may exercise jurisdiction. To the extent that the court in *United States ex. rel. Deop v. Wayne County Community College District*, 242 F. Supp. 2d 497 (E.D. Mich. 2003), concluded otherwise, this Court disagrees with that analysis.

Dated: January 5, 2010 /s/ Gordon J. Quist
GORDON J. QUIST
UNITED STATES DISTRICT JUDGE