UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

LANSING COMMUNITY COLLEGE and
MIDDLE CITIES RISK MANAGEMENT
TRUST

    Plaintiffs,

v.                                                  Case No. 1:09-CV-111

NATIONAL UNION FIRE INSURANCE         HON. GORDON J. QUIST
COMPANY OF PITTSBURGH, PA.,

    Defendant.
_____/

## **OPINION**

Plaintiffs, Lansing Community College ("LCC") and Middle Cities Risk Management Trust ("Middle Cities"), have sued Defendant, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), seeking, among other things, a declaration that National Union is obligated to pay defense costs and indemnify LCC and its employees under a Not-For-Profit Protector policy in litigation captioned *Claude McCollum v. Rodney Bahl, et al.*, No. 1:08-CV-96, pending before this Court. Plaintiffs originally filed their complaint, alleging claims for a declaratory judgment, breach of contract, promissory estoppel, fraudulent misrepresentation, and violation of the Michigan Uniform Trade Practices Act, in the Ingham County Circuit Court. National Union removed the case to this Court pursuant to 28 U.S.C. § 1441, alleging diversity of citizenship as the basis for jurisdiction.[1]

National Union has now moved for summary judgment. For the reasons set forth below, the Court will grant the motion and dismiss Plaintiffs' complaint with prejudice.

---

[1] The Court previously held that LCC is a citizen for purposes of diversity jurisdiction and denied Plaintiffs' motion to remand in separate Orders issued on January 5, 2009 (docket nos. 35, 36).

# I. FACTS

A.     **The Underlying Litigation**[2]

On or about January 24, 2008, Claude Zain McCollum ("McCollum") filed a lawsuit in the Ingham County Circuit Court against LCC and other defendants alleging various claims, including violation of his federal civil rights, in connection with his wrongful arrest, prosecution, and conviction for the murder and sexual assault of Carolyn Kronenberg, an LCC professor, on January 25, 2005. The victim was found in the Student Personnel Services Building on LCC's campus in downtown Lansing, Michigan, where she was preparing to teach a class. The subsequent investigation determined that the murder occurred that morning between 8:30 a.m. and 8:45 a.m. At the time of the murder, McCollum was an LCC student and was present in the Technology and Learning Center Building, a separate building on campus.

The LCC Police Department immediately began an investigation for the identity of the murder suspect. LCC police officers Rodney Bahl and Brian McManus conducted the investigation under the supervision of LCC officer John Imeson. The officers soon focused their investigation upon McCollum and took him in for questioning on January 25, 2005. Following the initial interview at LCC's facility, Officers Bahl and McManus took McCollum to the City of Lansing Police Department for additional questioning. McCollum alleges that during this interview, the officers provided him with details of the crime known only to the police and the perpetrator and then solicited statements from McCollum based upon the information provided to him. The officers then used McCollum's manufactured statements to secure a criminal complaint and warrant for the murder and sexual assault of Professor Kronenberg. McCollum was arrested and jailed without bond pending further proceedings.

---

[2]The facts concerning the underlying litigation are taken from McCollum's First Amended Complaint. Although McCollum's Second Amended Complaint is the current operative pleading in that case, the allegations in the Second Amended Complaint do not differ materially from those in the First Amended Complaint for purposes of the instant motion.

McCollum was subsequently tried and convicted of murder and criminal sexual conduct in the first degree and sentenced to life in prison.

McCollum appealed his conviction to the Michigan Court of Appeals. Shortly before oral argument, McCollum's appellate counsel and the prosecutor filed a joint motion to vacate the conviction and remand the matter back to the trial court. The motion was based upon new evidence indicating that a third party committed the crime, as well as videotape evidence showing that McCollum was in a different building on campus at the time the murder was committed. The court of appeals granted the motion, vacated the conviction, and remanded the matter back to the trial court. On October 24, 2007, all charges against McCollum were dismissed.

Following dismissal of the charges, McCollum sued various individuals and entities that were involved in securing his conviction. McCollum initially sued LCC Police Officers Bahl, McManus, and John Imeson; City of Lansing Police Officer Bruce Lankheet; Ingham County Prosecutor Stuart J. Dunnings and Assistant Prosecutors Eric E. Matwiejczyk and Marie L. Wolfe; and Michigan State Police Officer James A. Young. McCollum also sued the City of Lansing, Ingham County, and LCC. McCollum alleged that, among other things, Defendants secured his wrongful conviction by failing to disclose a videotape that showed McCollum in a different building when the murder occurred and would have exonerated him from the charged crimes. Defendants removed the case to this Court on the basis of the federal claims under 42 U.S.C. § 1983. Following a series of voluntary dismissals and dismissals on motions, the only defendants now remaining in the case are Bahl, Imeson, and LCC.

**B.     LCC's Request for a Defense from National Union**

During the period of time relevant to McCollum's claims, LCC was insured under a Not-For-Profit Individual and Organization Insurance Policy issued by National Union (the "Policy").[3] LCC

---

[3] The Policy was actually issued by National Union's parent, American International Group, Inc.

was also insured under a general liability policy issued by Plaintiff Middle Cities (the "Middle Cities policy").

On December 7, 2007, McCollum's counsel sent a letter to LCC advising LCC of McCollum's intent to file a civil complaint against LCC and its employees arising out of his wrongful arrest, prosecution, and conviction for the Kronenberg sexual assault and murder. On December 13, 2007, LCC's representative notified National Union of the threatened lawsuit. On January 22, 2007, National Unition sent a letter to LCC stating that although no claim had been filed as defined by the Policy, National Union would accept LCC's notice "as a potential claim or notice of circumstances which may give rise to a future claim." (Letter of 1/22/07 from de Blank to Jones at 2, Def.'s Br. Supp. Ex. D.) National Union further advised LCC to forward any information, documents, or pleadings to National Union in the event a complaint was filed to allow National Union to review it for possible coverage under the Policy. Finally, National Union referred to the "other insurance" provision of the Policy but did not specifically cite any potential exclusion from coverage. In addition to notifying National Union of the potential claim, LCC notified Middle Cities, and Middle Cities agreed to provide coverage under a reservation of rights.

On January 29, 2008, after McCollum filed his complaint in state court, LCC sent National Union a copy of the summons and complaint and advised National Union that it had already retained Dickinson Wright, PLLC as defense counsel. On February 26, 2008, AIG claims representative Elena de Blank sent a letter on behalf of National Union to LCC regarding the McCollum lawsuit. Discussing coverage, de Blank wrote, "Our supplemental view is that coverage may be afforded for certain of the Loss suffered as a result of this matter, subject to our continuing analysis and reservations contained herein." (Letter of 2/26/08 from de Blank to Jones at 2, Def.'s Br. Supp. Ex. G.) In addition, de Blank pointed out possibly applicable exclusions 4(b) and 4(h) for loss arising out of any criminal or fraudulent act or for bodily injury, sickness, disease, death of any person, or

4

damage to or destruction of property. (*Id.* at 2-3.) The letter consented to the retention of Dickinson Wright as counsel:

> We understand that Lansing Community College has retained Dickinson Wright as defense counsel for this matter. Please note that Clause 9 requires the Insured retain panel counsel for this type of claim. However, National Union will consent to the retention of Dickinson Wright in regards to the matter subject to the following rates, $250 for partners, $200 for associates, and $85 for paralegals. These rates shall remain in effect for the life of the claim, unless a subsequent changes [sic] is mutually agreed upon. <u>Please note that the Insurer now requires a first report from panel counsel, with an action plan, within 30 days of receipt of this letter.</u> In addition, kindly forward panel counsel a copy of the attached "Defense Counsel Guidelines" and advise that we request quarterly status reports (more often as significant events arise).

(*Id.* at 3.) De Blank also requested that LCC contact her in the event it received a settlement demand or decided to make an offer, and she again referenced the Policy's "other insurance" provision. Finally, de Blank cautioned:

> The above discussion is based upon information furnished to date and is by necessity subject to supplementation. No statement herein should be considered a waiver of any right, defense or privilege that National Union may have under the policy or law, regardless of whether the provision has been noted herein. It is understood that all rights remain fully and mutually reserved.

(*Id.*)

National Union instructed LCC and Dickinson Wright to have Dickinson Wright send its invoices directly to LCC for payment of the first $100,000 of attorney fees in satisfaction of LCC's self-insured retention under the Policy. (Butler Aff. ¶ 10, Pls.' Resp. Br. Ex. 6.) In accordance with those instructions, LCC paid Dickinson Wright's invoices during the next six months until the deductible was exhausted.

In October 2008, National Union sent a letter to LCC stating that because Middle Cities had accepted the claim for coverage, the Policy was excess to the Middle Cities policy because the Policy did not have a duty to defend. (Def.'s Br. Supp. Ex. H.) National Union requested that LCC keep it informed of any activities or developments in the claim. National Union also asserted the

right to raise additional coverage defenses based upon new information it might receive, but it did not assert any specific defenses or exclusions in the letter.

LCC, through its counsel, sent a letter to National Union on December 4, 2008, requesting National Union to re-evaluate its position on the excess insurance issue. Before National Union responded, however, Plaintiffs filed their complaint in this case in state court. Subsequently, on January 15, 2009, National Union's counsel sent LCC's counsel a letter denying coverage under Endorsement No. 9, which excludes coverage for claims arising from the rendering or failure to render "professional services." In addition, National Union asserted that it had no duty to defend because LCC did not tender the defense to National Union but instead chose to retain its own defense counsel to defend the claim.

## II. Discussion

National Union has moved for summary judgment on two grounds. First, it contends that the claims in the McCollum case fall within the scope of Endorsement No. 9 of the Policy, which excludes coverage for claims arising out of the rendering or failure to render professional services for which registration or a license is required by federal, state, or applicable local law. Second, National Union contends that even if the professional services exclusion does not apply, the Policy is excess to the Middle Cities policy and coverage is not available under the Policy until the limits of the Middle Cities policy are exhausted.

Plaintiffs dispute that the professional services exclusion applies. Plaintiffs primarily argue that the exclusion does not apply because its police officers are not required to be registered or licensed by any governmental agency. Plaintiffs further contend that the Policy is not excess because National Union had a duty to defend under the Policy and it expressly accepted the defense when it approved LCC's retention of Dickinson Wright. Finally, Plaintiffs argue that National Union is barred from asserting the professional services exclusion because it waived any reliance on that defense by failing to assert it and accepting the defense of the claim.

As set forth below, the Court concludes that National Union did not waive its right to assert the professional services exclusion, nor is it estopped to assert the exclusion. In addition, the Court concludes that the professional services exclusion applies to the claims asserted by McCollum.

A.  **National Union Did Not Waive And Is Not Estopped From Asserting The Professional Services Exclusion**

Plaintiffs contend that National Union has waived its right to assert, or is estopped from asserting, the professional services exclusion as a defense to coverage under the National Union Policy.

In *Kirschner v. Process Design Associates, Inc.*, 459 Mich. 587, 592 n.W.2d 707 (1999), the Michigan Supreme Court summarized Michigan law concerning application of principles of waiver and estoppel against insurance companies. First, "once an insurance company has denied coverage to an insured and stated its defenses, the insurance company has waived or is estopped from raising new defenses." *Id.* at 593, 592 N.W.2d at 709. *See also Lee v. Evergreen Regency Coop. & Mgmt. Sys., Inc.*, 151 Mich. App. 281, 285, 390 N.W.2d 183, 185 (1986). Second, "when an insurance company undertakes the defense of its insured, it has a duty to give reasonable notice to the *insured* that it is proceeding under a reservation of rights, or the insurance company will be estopped from denying its liability."[4] *Kirschner*, 459 Mich. at 593, 592 N.W.2d at 709 (citing *Meirthew v. Last*, 376 Mich. 33, 39, 135 N.W.2d 353, 356 (1965)). In spite of these rules permitting waiver and estoppel against an insurer, the court cautioned that "[t]he application of waiver and estoppel is limited, and, usually, the doctrine will not be applied to broaden the coverage of a policy to protect the insured against risks that were not included in the policy or that were expressly excluded from the policy." *Id.* at 593-94, 592 N.W.2d at 709-10. In fact, Michigan courts have long recognized the limited scope of waiver and estoppel against insurers:

---

[4]Michigan courts have held that a declaratory judgment action asserting policy exclusions is a suitable alternative to a reservation of rights letter as a means for the insurer to provide notice to its insured. *See Sec. Ins. Co. of Hartford v. Daniels*, 70 Mich. App. 100, 116, 245 N.W.2d 418, 427 (1976).

> The cases where the doctrine of waiver, or estoppel, has been applied have largely been cases where the insurance companies have relied on a forfeiture of the contract, upon breaches of the warranties and conditions to work such forfeitures; and in many such cases this court and other courts of last resort have held that if the companies have led the other party, to his prejudice, to his expense, to understand that such forfeitures, such breached [sic] of warranties and conditions, would not be insisted upon, then the companies would be estopped from asserting such defenses. But here, the defendant makes no claim of forfeiture of the contract; on the contrary, it is insisting upon the contract itself, and insisting that by its terms it did not insure the deceased when engaged in military services in time of war. To apply the doctrine of estoppel and waiver here would make this contract of insurance cover a loss it never covered by its terms, to create a liability not created by the contract and never assumed by the defendant under the terms of the policy. In other words, by invoking the doctrine of estoppel and waiver it is sought to bring into existence a contract not made by the parties, to create a liability contrary to the express provisions of the contract the parties did make.

*Ruddock v. Detroit Life Ins. Co.*, 209 Mich. 638, 653-54, 177 N.W. 242, 248 (1920).

In spite of this limited application, Michigan courts have applied waiver and estoppel in two classes of cases to impose liability on an insurance company for risks not covered by a policy or expressly excluded from coverage.

> The first class involves companies which have rejected claims of coverage and declined to defend their insureds in the underlying litigation. In these instances, the court has held that the insurance company cannot later raise issues that were or should have been raised in the underlying action. . . .
>   The second class of cases allowing the limits of a policy to be expanded by estoppel or waiver despite the holding of *Ruddock* involves instances of where the inequity of forcing the insurer to pay on a risk for which it never collected premiums is outweighed by the inequity suffered by the insured because of the insurance company's actions. The insurance company has either misrepresented the terms of the policy to the insured or defended the insured without reserving the right to deny coverage.

*Lee v. Evergreen Regency Coop. & Mgmt. Sys., Inc.*, 151 Mich. App. 281, 286-87, 390 N.W.2d 183, 186 (1986) (citations omitted).[5]

---

[5] In *Grosse Pointe Park v. Michigan Municipal Liability and Property Pool*, 473 Mich. 188, 702 N.W.2d 106 (2005), an evenly-split Michigan Supreme Court, in dictum, addressed whether equitable estoppel could ever be used to broaden coverage under an insurance policy. Because Justice Corrigan did not participate, only six members of the court voted. In the opinion of the court, delivered by Justice Cavanagh and joined by Justices Weaver and Kelly, Justice Cavanagh concluded that the city failed to establish the elements required to estop the insurer from invoking the pollution exclusion at issue. *Id.* at 203-07, 702 N.W. at 116-18. In particular, Justice Cavanagh found that due to the insurer's reservation of rights letter, the city could not have justifiably relied upon any acts or representations by the insurer. *Id.* at 204-05, 702 N.W.2d at 116-17. In a footnote, Justice Cavanagh said that *Kirschner* expressly recognized that estoppel may be applied in certain circumstances to extend coverage beyond the risks the insurer assumed in the policy. *See id.*

Plaintiffs asserts that National Union waived or is estopped from relying on the professional services exclusion because it agreed to provide LCC a defense without asserting the professional services exclusion and/or because National Union denied coverage based on the other insurance clause without raising the professional services exclusion. Both arguments fail.

Contrary to Plaintiffs' assertion, National Union did not deny coverage in its October 9, 2008, letter. Rather, National Union merely asserted that the Policy was excess to the Middle Cities policy because Middle Cities had accepted the claim for coverage. Nothing in that letter suggests that National Union was denying coverage. In its February 26, 2008, letter, National Union advised LCC that "coverage may be afforded for certain of the Loss" under the Policy. The October 9, 2008, letter did not alter National Union's prior statement that the Policy may afford coverage; it merely clarified National Union's position on the Policy's relationship to the Middle Cities policy under the other insurance provision. National Union did not, in fact, deny coverage until it sent its January 15, 2009, letter, in which it asserted that the professional services exclusion precludes coverage for the McCollum lawsuit. Whether National Union actually agreed to provide LCC a defense is debatable, but for purposes of the instant motion the Court will assume that National Union agreed to provide a defense.

Plaintiffs do not argue, nor could they, that this case falls within the first class of cases identified in *Lee*, *supra*, because National Union is not attempting to raise an issue that was or should have been raised in the underlying case. Moreover, as noted above, when National Union

---

at 206 n. 12, 702 N.W.2d at 117 n.12. Justice Young, joined by Chief Justice Taylor and Justice Markman, wrote a separate opinion concurring in the result but suggesting that equitable estoppel should never be applied to expand coverage beyond that originally contemplated by the parties in the policy. *Id.* at 208-09, 222-23, 225, 702 N.W.2d at 118-19, 126-28. Because neither opinion garnered a majority, *Grosse Pointe Park* is of limited utility, and this Court must look to the Michigan Supreme Court's most recent precedential statement in *Kirschner*. *See Amerisure Mut. Ins. Co. v. Carey Transp., Inc.*, 578 F. Supp. 2d 888, 911 (W.D. Mich. 2008) (noting that *Grosse Pointe Park* "is of limited assistance in predicting whether the Michigan Supreme Court would permit waiver or estoppel against an insure to require coverage for an excluded item").

9

did deny coverage, it asserted the exclusion upon which it relies in this case. Thus, waiver or estoppel can apply only if the case falls within the second class of cases in *Lee*.

To fall within the second class of cases in *Lee*, Plaintiffs must show that the inequity of forcing National Union to pay on a risk that it did not assume is outweighed by the inequity suffered by LCC. *Smit v. State Farm Mut. Auto. Ins. Co.*, 207 Mich. App. 674, 682-83, 525 N.W.2d 528, 532 (1994). Plaintiffs cannot sustain this burden. First, there is no evidence that National Union misrepresented the terms of the Policy to LCC. *See Industro Motive Corp. v. Morris Agency, Inc.*, 76 Mich. App. 390, 395, 256 N.W.2d 607, 609 (1977) (holding that the defendants, an insurance agent and an insurance company, were estopped from denying coverage for business interruption damage where both defendants knew the plaintiff desired replacement coverage identical to its existing coverage, led the plaintiff to believe that the replacement coverage would be the same, and failed to inform the plaintiff of the change in coverage, and the plaintiff cancelled its existing coverage based upon the defendant's acts). Second, Plaintiffs cannot show that National Union defended without notifying LCC that it reserved its right to deny coverage. Even if National Union is deemed to have assumed the defense of the underlying case by consenting to LCC's retention of Dickinson Wright, National Union specifically informed LCC that it was not waiving any defenses and reserved its rights to assert coverage defenses. National Union affirmed its reservation of rights not only in its February 26, 2008, letter, but also in its October 9, 2008, letter, in which it first asserted that the Policy was excess to the Middle Cities policy. Thus, there is no basis to conclude that National Union voluntarily waived or abandoned its right to rely on the professional services exclusion. *See Hakeem v. Lumbermens Mut. Cas. Ins. Co.*, No. 254454, 2005 WL 3237852, at *1 (Mich. Ct. App. Dec. 1, 2005) (holding that there was no basis to conclude that the defendant insurer waived its right to rely upon a policy exclusion where the insurer consistently stated that it was not waiving its rights under the policy).

Relying upon *Meirthew v. Last*, 376 Mich. 33, 135 N.W.2d 353 (1965), Plaintiffs argue that LCC need not show prejudice because prejudice is presumed, and if unrebutted, is established as a matter of law. Plaintiffs' reliance on *Meirthew* is misplaced because the facts in that case are substantially different from those in the instant case. In *Meirthew*, a garnishment proceeding, the insurer agreed to defend the insured under a general reservation of rights that did not identify the particular exclusion. The insurer did not identify the particular exclusion upon which it sought to rely until after judgment was entered in the underlying case. The court held that the insurance company's notice was not only insufficient, but that it "came too late to avoid presumptive prejudice of [the insured's] rights and plaintiff's consequential rights." *Id.* at 38, 135 N.W.2d at 355. In contrast to *Meirthew*, National Union did not unreasonably delay in asserting a policy exclusion. Initially, National Union identified two potentially applicable exclusions in its February 26, 2008, letter, within about one month after McCollum filed his complaint. While National Union did not identify the professional services exclusion until almost one year later, in its January 15, 2009, letter, it did so well before the close of discovery or the filing of dispositive motions in the McCollum case. Moreover, because National Union notified LCC that it had reserved its rights and raised at least two possible exclusions, LCC could not have reasonably believed that National Union would not contest coverage. *See Allstate Ins. Co. v. Keillor*, 203 Mich. App. 36, 39, 511 N.W.2d 702, 704 (1993) (holding that the insurer could not be estopped from asserting its exclusions because there was no unreasonable delay, where the insurer asserted two exclusions one year after the complaint was filed in the underlying case and an additional exclusion was identified six months later); *Auto Club Group Ins. Co. v. Rush*, No. 257419, 2006 WL 171494, at *4 (Mich. Ct. App. Jan. 24, 2006) ("Unlike *Meirthew*, here, plaintiff brought its declaratory judgment action against [the insured] and [the plaintiff in the underlying case] before a trial in the wrongful death suit, giving clear notice that it intended to deny coverage on the basis of the 'recreational land motor vehicle' provision.").

Plaintiffs also argue that National Union should be estopped from denying coverage because the inequity LCC suffered outweighs any inequity National Union would suffer by covering a loss not covered by the Policy. Specifically, LCC contends that National Union was in possession of all the facts it needed in order to assert the professional services exclusion but failed to do so until after LCC had paid Dickinson Wright $100,000 in fees and costs and made decisions in the underlying case based upon its belief that it had coverage under the Policy. An estoppel arises when a party: (1) by representation, admission, or silence intentionally or negligently induces another party to believe certain facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of those alleged facts. *Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 281 Mich. App. 429, 445-46, 761 N.W.2d 846, 858 (2008) (citing *Van v. Zahorik*, 460 Mich. 320, 335, 597 N.W.2d 15, 22 (1999)).

Plaintiffs cannot show that National Union intentionally or negligently induced LCC to believe that National Union would not rely on the professional services exclusion because National Union consistently advised LCC that it was not waiving any right, privilege, or defense under the Policy. In light of these statements, LCC could not have justifiably believed that National Union would not rely on an exclusion to deny coverage. Moreover, Plaintiffs fail to support their claim of prejudice to LCC. Plaintiffs offer an affidavit from their counsel, Mr. Butler, to show that because of its reliance on National Union's statements, LCC lost a chance to settle the case within the $1 million limits of the Middle Cities policy. However, Mr. Butler does not state that McCollum was willing to settle with LCC for the $1 million policy limits. Rather, he merely states: "It is my belief that Mr. McCollum was willing to accept the amounts demanded due to the number of defendants still present in the case at that time." (Butler Aff. ¶ 15.) Furthermore, there is no indication in the record that LCC informed National Union of any potential settlement, as it was obligated to do under the Policy. Similarly, Plaintiffs fail to show that LCC was prejudiced by the

payment of $100,000 to Dickinson Wright. Plaintiffs present no evidence to support their assertion that LCC would not have paid the $100,000 to Dickinson Wright had it known that National Union would deny coverage. Moreover, Plaintiffs admit that Middle Cities has been providing a defense to LCC. (Compl. ¶¶ 15, 35.) And, even if Middle Cities were not providing a defense, LCC would have had to pay counsel to defend the underlying case, and LCC chose Dickinson Wright to do so.

> **B.** **The Professional Services Exclusion Precludes Coverage**

Michigan law construes insurance contracts generally in the same manner as other contracts. *Farmers Ins. Exch. v. Kurzmann*, 257 Mich. App. 412, 417, 668 N.W.2d 199, 203 (2003). An insurance policy must be read as a whole in order to discern and effectuate the parties' intent. *Id.* at 418, 668 N.W.2d at 203. Courts must accord the terms of a policy their plain and ordinary meaning. *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566, 489 N.W.2d 431, 433-34 (1992). "Any clause in an insurance policy is valid as long as it is clear, unambiguous and not in contravention of public policy." *Raska v. Farm Bureau Ins. Co.*, 412 Mich. 355, 361-62, 314 N.W.2d 440, 440 (1982). An insurance policy is deemed ambiguous when its provisions are capable of two or more interpretations that conflict. *Fromm v. Meemic Ins. Co.*, 264 Mich. App. 302, 311, 690 N.W.2d 528, 533 (2004). Ambiguous insurance policies and exclusions are construed against the insurer. *See Bruce v. Cuna Mut. Ins. Soc'y*, 219 Mich. App. 57, 60, 555 N.W.2d 718, 720 (1996). However, a clear and specific exclusion must be given effect, because an insurance company cannot be held liable for risks it did not agree to assume. *South Macomb Disposal Auth. v. Am. Ins. Co.*, 225 Mich. App. 635, 653, 572 N.W.2d 686, 695 (1997).

The professional services exclusion precludes coverage for claims "alleging, arising out of, based upon or attributable to or in any way relating to the rendering or failure to render any professional services for which registration or license is required by the federal, state or applicable local government." By its terms, in order to apply, a claim against the insured must: (1) allege, arise

13

out of, be based upon, or be attributable to; (2) the rendering or failure to render professional services; and (3) for which a license or registration is required by federal, state, or local law. All three requirements are present in this case.

First, although the Policy does not define "professional services," Michigan courts have considered the meaning of "professional services" in cases involving similar exclusions. In *St. Paul Fire & Marine Insurance Co. v. Quintana*, 165 Mich. App. 719, 419 N.W.2d 60 (1988), the court stated that a professional service "is something more than an act flowing from mere employment or vocation . . . [but instead] must be such as exacts the use or application of special learning or attainments of some kind." *Id.* at 723, 419 N.W.2d at 62 (internal quotations omitted) (quoting *Hirst v. St. Paul Fire & Marine Ins. Co.*, 106 Idaho 792, 796, 683 P.2d 440, 444 (1984)). In *American Fellowship Mutual Insurance Co. v. Insurance Co. of North America*, 90 Mich. App. 633, 282 N.W.2d 425 (1979), the Michigan Court of Appeals affirmed the trial court's conclusion that the services of an insurance adjuster could be considered "professional services" for purposes of the exclusion at issue. The court of appeals noted, with approval, that the trial court considered the definition of "professional service" under the Michigan Professional Service Corporation Act, M.C.L. § 450.221, *et seq.*, which is "a personal service to the public which requires as a condition precedent to the rendering of such service the obtaining of a license or other legal authorization." *See id.* at 636, 282 N.W.2d at 426.

No Michigan court has addressed the issue of whether police services constitute "professional services" for purposes of an insurance policy exclusion. However, in *Western World Insurance Co. v. American and Foreign Insurance Co.*, 180 F. Supp.2d 224 (D. Me. 2002), the court, applying Maine law, concluded that allegations against police officers in the underlying case arose out of the rendering of professional services. The court considered the following discussion on the issue of professional services by the Nebraska Supreme Court in *Marx v. Hartford Accident and Indemnity Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968):

> Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. . . . In determining whether a particular act is of a professional nature or a "professional service," [the court] must look not to the title or character of the party performing the act, but to he act itself.

*Id.* at 231 (quoting *Marx*, 183 Neb. at 13-14, 157 N.W.2d at 871-72). Turning to the allegations of the underlying complaint, the court concluded that the defendant officers' use of deadly force, which formed the basis of the plaintiff's allegations, arose form decisionmaking based upon specialized training and experience. *Id.* at 232. Although not binding on this Court, the Court considers the *Western World* court's analysis persuasive. Moreover, it is significant that *Hirst*, the Idaho case cited by the Michigan Court of Appeals in *Quintana*, *supra*, quoted *Marx*, the Nebraska Supreme Court case quoted in *Western World*. Thus, *Western World* and *Quintana* employed similar, if not the same, definitions of "professional services."

Based upon the foregoing cases, the court concludes that because police officers receive specialized training and education and often are called upon to make decisions using this specialized training, their activities may constitute "professional services" as that term is normally understood. Thus, police activities such as interviewing suspects and witnesses, investigating crimes, and assisting in the prosecution of criminal cases are the types of activities that may be considered professional services.

Next, the Court must determine whether LCC's police officers are required to be registered or licensed in order to perform the services that are the subject of the underlying case. Section 128(1) of the Community College Act, M.C.L. § 389.128(1), provides that the board of trustees of a community college "may grant to the public safety officers or police officers of that community

15

college the powers and authority of a peace or law enforcement officer." If the board of trustees grants such powers to its police officers, they "shall meet the minimum standards of the Michigan law enforcement officers training council act of 1965." M.C.L. § 389.130. The Michigan Law Enforcement Officers Training Council Act of 1965, now known as the Commission on Law Enforcement Standards Act ("CLESA"), M.C.L. § 28.601, *et seq.*, sets minimum standards for police officers. The Michigan Commission on Law Enforcement Standards ("MCOLES") is a division within the Department of State Police that is charged under CLESA with carrying out the intent of CLESA through the promulgation of rules to establish minimum law enforcement standards and the certification of individuals as police officers. M.C.L. § 28.603(1). A person must be certified by MCOLES in order to serve as a police officer. M.C.L. § 28.609a(1). Pursuant to MCOLES' administrative rules, an individual may serve as a police officer only after completing the required training and passing a licensing exam and obtaining a license. R. 28.14503, R. 28.14504. In addition, the individual must be employed by an "employing agency," defined as "police departments, sheriff offices, the Michigan department of state police, or any law enforcement agency authorized and established pursuant to state statute." R. 28.14102(b).

The LCC police department is a law enforcement agency authorized and established pursuant to state statute because it was established pursuant to the Community College Act. Moreover, as noted, under the Community College Act, LCC's police officers must meet the minimum standards of CLESA. In accordance with these requirements, LCC police officers are licensed by MCOLES:

> LCC Police Department employs sworn police officers with full powers of arrest under the authority of the Michigan Community College Act and licensed by the Michigan Commission on Law Enforcement Standards. LCC police officers are also sworn deputy sheriff's [sic] in Ingham County, having full law enforcement authority on non-college property.

(LCC Police Dep't Annual Campus Safety Report, Def.'s Reply Br. Ex. B.)

LCC asserts that the Community College Act does not require its officers to be licensed, but only that they "meet the minimum standards" of CLESA. This argument lacks merit because the license issued by MCOLES is the evidence that police officers meet such standards. In other words, issuance of a license is part and parcel of the requirement that officers meet the minimum qualifications of CLESA.

The final requirement for the application of the professional services exclusion is that the claim must arise out of or be based upon the rendering of professional services. This requirement is met because McCollum's claims, to the extent they concern LCC's police officers, allege that McCollum's arrest and conviction resulted from the officers' improper criminal investigation and prosecution. For example, McCollum alleges that LCC's officers used improper interrogation techniques and failed to turn over exculpatory evidence. (McCollum 1st Am. Compl. ¶¶ 31-34; 39-41; 43; 89; 127; 129-132.) In performing these acts the officers utilized the specialized training and education they received to become certified as police officers. Similarly, the allegations against LCC based upon its alleged failure to properly train, supervise, or discipline the LCC officers fall within the scope of the professional services exclusion because these alleged failures arise out of or relate to the LCC officers' conduct during the investigation of the crime and prosecution of McCollum. Thus, the allegations against LCC arise out of the rendering or failure to render "professional services." *See Western World*, 180 F. Supp. 2d at 233.

LCC argues that some of the allegations, such as failure to properly maintain and organize investigative files, concern clerical or administrative tasks rather than professional services. However, these activities occurred within the course of the criminal investigation and prosecution, and thus arose from the rendering of, or failure to render, professional services. *See White v. Auto-Owners Ins. Co.*, Nos. 265380, 265389, 2006 WL 664206, at *3 (Mich. Ct. App. Mar. 16, 2006)

("While a misplaced record or a telephone or facsimile message may have initiated the problem, those actions alone did not cause Ogburn's injury. . . . The injury that Ogburn suffered was the result of improper follow-through after a medical procedure, which encompasses the failure to render a medical services. . . . Because some portions of that duty included clerical tasks does not change the overall nature of the duty.") (citation omitted).

LCC further contends that McCollum's allegations that LCC and its officers took actions to force a false confession and conceal exculpatory evidence were not professional services within the scope of the officers' employment. LCC cites *Quintana*, *supra*, in which the court held that a doctor's sexual assault on a patient did not constitute a professional service. LCC's reliance on this case is misplaced because the officers did not commit a sexual assault. Rather, they performed duties within the scope of their employment, even if performed in a reckless or negligent manner.

Finally, LCC contends that summary judgment is improper for two other reasons, neither of which has merit. First, it argues that the exclusion is ambiguous because the Policy provides coverage for claims of "false arrest or wrongful detention" – claims most likely to be asserted against LCC's police officers. This argument fails, however, because it is well established that if there is a conflict between the terms of an endorsement and the form provisions of an insurance contract, the language of the endorsement controls. *Royce v. Citizens Ins. Co.*, 219 Mich. App. 537, 544, 557 N.W.2d 144 (1996). Here, Endorsement No. 9 merely serves to narrow the scope of coverage provided under the Policy. Second, LCC contends that summary judgment should be denied because LCC has not been afforded the opportunity for discovery, thus rendering summary judgment premature. The Sixth Circuit cases LCC cites are inapposite because in those cases the nonmoving party submitted an affidavit under Fed. R. Civ. P. 56(f). *See* Fed. R. Civ. P. 56(f). LCC has not done so in this case, nor has it explained why discovery would produce a different

result when the issue before the Court is one of law based upon the unambiguous provisions of the Policy. *See Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196 (6th Cir. 1995) ("[I]f the appellant has not filed either a Rule 56(f) affidavit or a motion that gives the district court a chance to rule on the need for additional discovery, this court will not normally address whether there was adequate time for discovery.") (citations omitted).

### III. CONCLUSION

For the foregoing reasons, the Court will grant summary judgment to National Union. Because each of Plaintiffs' claims is based upon National Union's failure to provide coverage under the Policy, and the Court has determined that the professional services exclusion precludes coverage, National Union is entitled to summary judgment on all claims.

An Order consistent with this Opinion will issue.


Dated: March 1, 2010                                        /s/ Gordon J. Quist
                                                                    GORDON J. QUIST
                                                           UNITED STATES DISTRICT JUDGE